## PEOPLE *v*. COLLINS.

1. HOMICIDE—EVIDENCE SUPPORTING THEORY OF PROSECUTION ADMISSIBLE.

   In a prosecution for murder, where the theory of the prosecution was that defendant killed deceased for fear she would disclose to the officers the fact that he was manufacturing and selling illicit whisky, it was competent to show, in a general way, the extent to which defendant had been engaged in said business, although unnecessary to go into the details to the extent allowed.

2. SAME—APPEAL AND ERROR—HARMLESS ERROR.

   In view of the fact that defendant freely admitted he had manufactured and sold illicit whisky, any error in allowing the prosecutor to go into the details of said business, *held*, not reversible.

3. SAME—CONSTITUTIONAL LAW—EVIDENCE—COERCION.

   Where defendant, accused of murder by strangulation, was asked to place his hand upon the neck of deceased, and he complied without any hesitation, and his fingers fitted into the marks, no constitutional right of defendant was invaded, there being no pressure or coercion used to compel him to do so.

---

The admissibility of evidence as to correspondence of finger prints to prove identity is discussed in notes in 43 L. R. A. (N. S.) 1206; 16 A. L. R. 370; 3 B. R. C. 70.

On admissibility of evidence of other crimes to show motive, see notes in 62 L. R. A. 199; 3 A. L. R. 1540; 22 A. L. R. 1016.

4. SAME—EVIDENCE—ADMISSIBILITY.
  Although testimony that the marks were made by an average hand rendered the testimony that defendant's hands fitted the marks perfectly of little probative value, it was not thereby rendered incompetent; its weight being for the jury.

5. SAME—CIRCUMSTANTIAL EVIDENCE FOR JURY.
  The evidence of defendant's guilt, although circumstantial, *held*, sufficient to present a case for the jury.
  McDONALD, CLARK, and MOORE, JJ., dissenting.

Error to Gratiot; Moinet (Edward J.), J. Submitted April 13, 1923. (Docket No. 104.) Decided June 4, 1923.

Oscar Collins was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Marquette. Affirmed.

*George P. Stone* and *C. H. Goggin*, for appellant.

*Andrew B. Dougherty*, Attorney General, and *Kelly S. Searl*, Acting Prosecuting Attorney, for the people.

BIRD, J. Defendant was convicted of a charge of murder and sentenced to the State prison at Marquette for the period of his natural life. · The crime for which he was convicted occurred in Alma. In the early evening of February 5, 1921, Mrs. Ellen Crowe, who had been doing some shopping down town, was on her way home. She stopped at the house of an acquaintance and remained there visiting about an hour. She started for home about 7 o'clock in the evening. Instead of going via the streets she went down the Ann Arbor railroad track, because it shortened the way. The railroad track extends in a southeasterly and northwesterly direction through the city of Alma. The deceased traveled on the track in a southeasterly direction about 80

rods.     She then left the track and crawled through a hole in the west railroad fence and started to go diagonally across some vacant lots to her home. When she had proceeded about 20 rods she was attacked and strangled to death.     Her body was found the following morning.     An autopsy was held, and medical men gave it as their opinion that she died by strangulation.

It was the theory of the people that defendant was a boot-legger; that the deceased had knowledge that defendant was manufacturing and selling illicit whisky, and that defendant was possessed of the belief that the deceased was liable to disclose it to the public officers; that this fear so worked on him that he killed her to avoid exposure.     The principal attack is made upon the failure of the people to make a case.     A motion was made for a directed verdict, but this was denied by the trial court.     This question involves, to some extent, a review of the evidence presented.     The people's evidence, in substance, shows:

1. That the deceased left the house of her friend at about 7 o'clock in the evening and entered the railroad right of way, which was near by.     She had about 80 rods to travel before she left it.     It was shown by witnesses, and admitted by defendant, that he left a certain grocery store for his home at about the same time, and that he also went on to the railroad right of way to go home.     Both lived in the same neighborhood in the outskirts of the city.     By this proof the people showed defendant was in a position to have committed the crime, and no one else is shown to have had the opportunity of seeing her after she started down the track.

2. It was established that defendant was, and had been for some time, a boot-legger.     He admitted this, although he at first denied it.     He appears to have

been afraid of some woman in his neighborhood. He expressed himself to several of his customers to this effect, and while he did not mention any names while expressing his fears he pointed in the direction of Mrs. Crowe's house. It did not appear what Mrs. Crowe knew concerning his sale of illicit whisky. It may have been because they lived in such close proximity that he thought she was aware of what he was doing. Whatever it was, and whether real or fancied, he appears to have believed some woman in his neighborhood knew what he was doing and was likely to "squawk" on him, as he expressed it. To some of his customers he said, referring to this woman: "She was going to squawk on him and G— d— her he would get her." The question whether he had reference in these conversations to Mrs. Crowe was one for the jury. If they found she was the party alluded to, this testimony would show a motive for committing the deed.

3. It was shown that just before the evening of the murder he had no scratches on his face, and that the next day he had several. Defendant explained that his 16-months old baby scratched his face the day before the body was found. There was other testimony bearing on this question which made it a question of fact as to when he received them.

4. Defendant's conduct the next morning after the murder was presented. He got up and sent his wife and children away to his brother's farm. After that he was seen talking rather excitedly to one of his companions engaged with him in the illicit whisky selling, and at times looking in the direction of the body. And it was further shown by one witness that when he went away from his home that morning he kept looking in the direction of where the body lay. These and other occurrences related are more or less in conflict. What significance they had, if

any, in connection with the other facts, was for the jury.

These were, in substance, the main facts presented by the people. In their presentation they were met with many denials and considerable conflict resulted. The facts presented, and the case made, by the people were circumstantial. Some of the circumstances standing alone were not very significant, but when considered in connection with the other facts presented we think they made a case which supports the conclusion of the jury.

5. Exception is taken to the extent that the prosecution went into the question of defendant selling illicit whisky. The motive for the murder, under the theory of the prosecution, made this question material. It was competent to show, in a general way, the extent to which defendant had been engaged in manufacturing and selling illicit whisky, but we think it was unnecessary to go into the details of his operations to the extent to which the prosecutor did upon his cross-examination of defendant. We are unable to hold, however, it was reversible error, because defendant freely admitted he had manufactured and sold illicit whisky.

6. While defendant was in custody he was taken to the undertaking rooms where the body lay. Mr. Vibber, who accompanied him, testified as follows:

"I asked him how he would like to go down to the morgue and see the body, and I told him we were going to the photograph gallery. When I told him about going down to the morgue he said 'all right.' I did not tell him what we were going for. We had these photographs taken and then we went to the morgue. He went voluntarily with us. The morgue is in the undertaking rooms of Mr. Wright. There was no one there except myself, the defendant and Mr. Bellows. Bellows got the body out where we

could see it. We went into the room where it was. I could see the marks that have been described here.

"*Q.* State what, if anything, you said to the defendant while you were in there.

"*A.* I asked him to place his hands in those marks. * * *

"*Q.* What did he do when you asked him to do that?

"*A.* He walked up and put his hands where I told him on the throat. * * *

"*Q.* Did you observe how the hand fitted into the finger marks, what were apparently finger marks on her throat?

"*A.* Yes, sir.

"*Q.* Tell how the thumb and fingers did fit?

"*A.* There was four marks on the left-hand side of the neck, and one or two on the other, and the fingers fit into those marks and the thumb fit the mark on the other side."

The trial court instructed the jury that he would let them consider this testimony for what it was worth. Later on, in the charge, in response to a request by defendant, he excluded the testimony and instructed the jury they must not consider it.

The claim is made that this testimony was incompetent. We take it the contention is, that asking defendant to place his hand on the marks on the throat of the deceased was compelling him to give evidence against himself and thereby invading his constitutional rights. It does not appear from the record that defendant was compelled to place his hand upon the throat of the deceased. He was requested to do so and complied without any hesitation. Unless some form of pressure or coercion is used the defendant's constitutional right would not be invaded. 16 C. J. p. 566. It is there said that:

"Compulsion is the keynote of the prohibition; and to render evidence inadmissible on the ground that defendant was compelled to produce it against himself,

it must appear that such compulsion was used as to rob him of volition in the matter."

"Where the accused voluntarily places his foot in the tracks or surrenders his shoes to the sheriff, he cannot object to evidence that they seemed to fit; and he may prove his offer to do this in his own favor." 12 Cyc. p. 402.

In *People v. Ecarius*, 124 Mich. 616, in which the defendant was charged with committing a murder with an iron bar as a weapon, he was required, upon cross-examination, to place the iron bar in his pocket for the purpose of showing how it might have been concealed. It was held that the illustration might properly have been made and with equal effectiveness with any other person as a witness and, therefore, the error, if any, was without prejudice.

In *People v. Keep*, 123 Mich. 231, which was a prosecution for robbery, where it appeared that stolen articles were found on defendant's premises and that a billy belonging to him was picked up near the scene of the crime, it was proper to admit evidence that a pointed-toe shoe found concealed in the defendant's barn and which made tracks corresponding to those near the place of the robbery fitted the defendant; it appearing that he wore such shoes at the time of the robbery, and ceased their use a short time afterwards.

In *People v. Breen*, 192 Mich. 39, while defendant was in the custody of the officers on a charge of burglary, his shoes were taken by an officer for the purpose of comparing them with footprints, and a deputy sheriff was permitted, over objection, to testify that they seemed to fit perfectly into the footprints. It was held by this court that the admission of such testimony was not error.

In *Walker v. State*, 7 Tex. App. 245 (32 Am. Rep. 595), it was held that it was not compelling a de-

fendant to give evidence against himself, within the meaning of the law, to require him to make an impression in a soft substance in order that said impression might be compared with a footprint apparently connected with the homicide. This case is cited in *People* v. *Ecarius, supra.*

Inasmuch as no constitutional question is involved I can see no difference in principle between compelling the prisoner to make an impression in a soft substance in order that the impression might be compared with a footprint, and asking him to place his hands upon the scars on the throat of the dead woman in the present case. It is true, the testimony of the deputy sheriff that his hands fitted the scars or marks on her throat was one which had very little probative force. But, if defendant had worn a seal ring and the seal had been embedded in her throat and left its imprint, it would then have had more probative force, and we think it would hardly have been contended that the testimony was not competent. Dr. Brainard said upon his cross-examination that the marks appeared to have been made by the average hand. If the marks were made by the average hand, then the testimony had very little probative force as identifying the defendant as her assailant, but this does not render the testimony incompetent, it simply goes to its weight. It would be competent to show in a murder case the size of the bullet which entered the body, and that the defendant was found in possession of a revolver which carried that size ball, yet there might be thousands of the same size revolvers and balls in existence. That fact would not make the testimony incompetent, but it would affect its weight.

I am of the opinion that the testimony was competent. The defendant made no objection to placing his hand upon the scars. He did it voluntarily when

asked and, therefore, no constitutional question is raised. Upon the question of identification, I think it was permissible to show that his hands fitted the marks, although hundreds of other hands in Alma might have fitted them just as well. It was simply one circumstance, with no great probative force, in the chain of circumstances, and was entitled to be considered with all the other facts in the case. In this view the first impression of the trial court was the right one, that it should have been submitted to the jury for what it was worth. The failure to do so and the instruction that they could not consider it, of course, resulted beneficially to the defendant and he cannot be heard to complain of it.

The testimony presented a case for the jury and the judgment of conviction is affirmed.

WIEST, C. J., and FELLOWS, SHARPE, and STEERE, JJ., concurred with BIRD, J.

CLARK, J. (*dissenting*). The verdict is against the great weight of the evidence. . The judgment should be reversed and a new trial granted.

McDONALD and MOORE, JJ., concurred with CLARK, J.